# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

Rolando Vasquez,

        Plaintiff,

v.

Union Pacific Railroad Co.,

        Defendant.

Case No. 5:22-cv-478

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff Rolando Vasquez ("Vasquez") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA").

## PRELIMINARY STATEMENT

1.      Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even where the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removed the employees disclosing these conditions from service. Union Pacific then subjected the employees to a Fitness-for-Duty evaluation, again regardless of whether the employee had been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is fit for duty and Union Pacific does

not conduct physical evaluations. Furthermore, it routinely disregards the opinions of outside doctors who provide physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," falsely determining that the employee is unfit for duty or issuing unnecessary work restrictions which it then refuses to accommodate.

2.      In February 2016, several Union Pacific employees commenced a class action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The United States District Court for the District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3.      Vasquez is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Vasquez was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific on the basis of his disability. Vasquez was a putative class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Vasquez's claims occurred in the Western District of Texas.

6.      Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in the Western District of Texas, and because Vasquez worked in the Western District of Texas and would have continued to work in the Western District of Texas but for Defendant's unlawful employment practices.

## THE PARTIES

7.      Vasquez resides in San Antonio, Texas. He was an employee of Union Pacific, working in various locations throughout Texas, most recently in Del Rio, Texas.

8.      Union Pacific is a railroad carrier engaged in interstate commerce with operations in Texas, and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9.      Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10.      The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels as "Reportable Health Events"

(Exhibit A.) This includes but is not limited to "bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)." (*Id.*)

11.     Union Pacific's Fitness-for-Duty program is even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns that the employee has, or has had in the past, certain other, non-listed health conditions, or because a manager refers an employee to Health and Medical Services for a Fitness-for-Duty evaluation.

12.     When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

13.     These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

14.     Union Pacific routinely disregards the opinions of the employee's treating doctor who has physically examined the employee and instead makes broad requests for medical information, including medical records, from the employee.

15.     Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department, located in Omaha, Nebraska, conducts a "file

review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty

16.     Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employee's ability to safely perform the essential functions of their jobs.

17.     When issuing these Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain health conditions or treatments in order to assign standardized work restrictions on employees.

18.     As part of these standardized protocols, the Health and Medical Services Department relied on the Federal Motor Carrier Administration ("FMCSA") 2014 Medical Examiner's Handbook ("The 2014 Medical Examiner's Handbook"), which the company downloaded from the FMSCA website in March 2014, to determine which health conditions required work restrictions, and to determine how long those restrictions should be imposed.

19.     Union Pacific's Chief Medical Officer at that time, Dr. John Holland, described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

20.     The recommendations contained in the 2014 Medical Examiner's Handbook, however, do not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

21.     In addition, by December 2014, the FMCSA withdrew the 2014 Medical

Examiner's Handbook from its website and no longer endorsed it for use for commercial

driver certifications.  Upon information and belief, the 2014 Medical Examiner Handbook

was never reindorsed by the FMCSA once it was removed from the website.

22.     By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA

removed the Handbook from its website, and it was no longer endorsed for use.

23.     Despite this, Union Pacific continued to rely on the outdated Handbook as

a basis to assign standardized work restrictions for its employees, including workers who

are not subject to FMSCA medical certification requirements.

24.     Union Pacific also represented to courts that the 2014 Medical Examiner

Handbook was reliable guidance and supported its decisions to impose standardized work

restrictions for its employees:

a.  "Union Pacific concluded that the 1% level of acceptable risk for sudden
incapacitation is consistent with the acceptable risk threshold recommended
by the FMCSA Medical Review Board and the 2014 version of the online
FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot.
for Class Certification at 21, *Harris et. al v. Union Pacific Railroad Co.*,
8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

b.  "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014)
to provide medical examiners guidance for making medical fitness-for-duty
recommendations for multiple health conditions that can impair the safety
for commercial vehicle drivers. These and other recent FMCSA guidance
documents, have served [] as reference materials and a general model for
developing the Medical Fitness-for-duty Guidelines presented here." Dr.
Holland Rebuttal Expert Report, May 11, 2018, *Harris et. al v. Union
Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

c.  "Since 2014, Union Pacific has relied on the FMSCA guidelines, as
reflected in its Medical Examiner Handbook, in determining whether
employees with epilepsy, a single unprovoked seizure, or other seizure risks
who work in safety sensitive positions have an unacceptably high seizure
risk such that it is appropriate to impose work restrictions." Decl. of Dr.
John Holland, dated Oct. 2, 2018 at 6, *Harris et. al v. Union Pacific*

       *Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

    d.   "[E]mployers may rely on their own physicians and FMCSA guidelines to make this sort of reasonable, safety-based medical judgment about an employee who drives commercial vehicles." Def.'s Br. in Supp. of Mot. for Summ. J. at 2, *Miller v. Union Pacific Railroad Co.*, 8:20-cv-00311-JFB-SMB, ECF No. 380.

25.     On information and belief, Union Pacific never informed any court addressing the legality of its Fitness for Duty program that the FMCSA removed the Handbook from its website, or that the Handbook was no longer endorsed for use by the FMCSA.

26.     As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

### *PLAINTIFF ROLANDO VASQUEZ*

27.     Vasquez was hired by Union Pacific in 2002.

28.     Most recently, Vasquez worked for Union Pacific as an Electronic Technician Inspector in Del Rio, Texas.

29.     On June 8, 2019, Vasquez was involved in a motorcycle accident. He suffered various injuries as a result, including an injury to his head. At the hospital, doctors prescribed anti-seizure medication to Vasquez as a precautionary measure. He took this medication for approximately seven days. Vasquez did not have a history of seizures prior to the accident, has never experienced a seizure, and has not taken anti-seizure medication since that time. Vasquez remained in the hospital for approximately two weeks, after which he was discharged to recover at home.

30.     Vasquez's medical providers cleared him to return to work at Union Pacific on July 29, 2019, with no restrictions.  Vasquez contacted Union Pacific about returning to work.

31.     Despite Vasquez being released by his treating medical providers, Union Pacific refused to allow him to return to duty, and instead required him to submit his medical records for a Fitness for Duty review.

32.     In April 2020, Dr. Laura Gillis, Chief Medical Officer of Union Pacific's Health and Medical Services Department, issued a "Fitness for Duty Determination" imposing the following work restrictions on Vasquez:

(1) No operating company vehicles, on-track or mobile equipment, or forklifts;

(2) No work on or near moving trains, freight cars or locomotives, unless protected by barriers;

(3) No operating cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee;

(4) No work at unprotected heights over 4 feet above the ground. Employee can work on the beds of trucks; and employee can occupy bridges following normal safety practices;

(5) No working on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang). Must have at least two additional employees on gang or at work area to accommodate the provisions of Train Approach Warning regulations (Lookout) or Train Approach Warning provisions may not be used.

33.     According to Union Pacific, these restrictions could not be reconsidered until June 2024, and then only if Vasquez remained seizure-free and stable off anti-seizure

8

medication and provided updated medical records and evaluations.

34.     In imposing the unnecessary and unwarranted restrictions on Vasquez, Dr. Gillis specifically relied on guidance from the outdated FMCSA Medical Examiner Handbook.

35.     No Union Pacific doctor ever physically examined Vasquez.  Instead, Dr. Gillis issued the restrictions based on a medical file review commissioned by Union Pacific.  The restrictions were in direct disregard of Vasquez's treating medical providers, who had cleared Vasquez to work without restrictions.

36.     On July 24, 2020, Union Pacific issued a letter stating that the unwarranted restrictions the company had imposed could not be "accommodated" by Vasquez's supervisor.

37.     Vasquez had no history of safety incidents at work before Union Pacific removed him from his position.

38.     Vasquez remains capable of working in his position to this day.

39.     On February 19, 2016, counsel for Vasquez, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law claims. The case was thereafter transferred to the District of Nebraska. *See Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

40.     The United States District Court for the District of Nebraska certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

41.     Because he was a putative class member in the *Harris* case, Vasquez's disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

42.     Vasquez timely filed a charge of discrimination with the EEOC on March 17, 2020. As a result of *Crown Cork* tolling, Vasquez had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Vasquez's and other putative class members' claims by an additional sixty (60) days. Vasquez filed his charge of discrimination with the EEOC within three hundred (300) days of Union Pacific's adverse employment action against him and well before the end of the tolling period. On April 21, 2022, the EEOC issued a right-to-sue letter. Vasquez now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I
### *VIOLATIONS OF THE ADA*
### *DISABILITY DISCRIMINATION – DISPARATE TREATMENT*

43.     The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

44.     At all relevant times, Vasquez was an individual with a disability under the ADA.

45.     At all relevant times, Vasquez had the requisite skill, experience, education,

and other job-related requirements of his position and was therefore a qualified individual under the ADA.

46.     At all relevant times, Vasquez could perform the essential functions of his position, with or without reasonable accommodations.

47.     Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

48.     Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

49.     Union Pacific discriminated against Vasquez on the basis of disability.

50.     Because Union Pacific violated 42 U.S.C. § 12112, Vasquez has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Vasquez is also entitled to attorneys' fees and costs incurred in connection with these claims.

51.     Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Vasquez. As a result, Vasquez is entitled to punitive damages.

## COUNT II
### *VIOLATIONS OF THE ADA*

11

### *DISABILITY DISCRIMINATION—DISPARATE IMPACT*

52.     Vasquez is a qualified individual with a disability under the ADA.

53.     Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

54.     Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

55.     Union Pacific discriminated against Vasquez on the basis of disability.

56.     Union Pacific's Fitness-for-Duty policies and practices disproportionately—and adversely—impacted qualified individuals with disabilities.

57.     Union Pacific uses qualification standards that screen out and tend to screen out individuals with disabilities.

58.     Union Pacific cannot show that such qualification standards are job-related and consistent with business necessity.

59.     Because Union Pacific violated 42 U.S.C. § 12112, Vasquez has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Vasquez is also entitled to attorneys' fees and costs incurred in connection with these claims.

60.     Union Pacific committed the above-alleged acts with reckless or deliberate

disregard for the rights and safety of Vasquez. As a result, Vasquez is entitled to punitive

damages.

## COUNT III
### *VIOLATIONS OF THE ADA*
### *FAILURE TO ACCOMODATE*

61.    Vasquez is a qualified individual with a disability under the ADA.

62.    Discriminating against a qualified individual with a disability includes:

[N]ot making reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a disability who is an
applicant or employee, unless such covered entity can demonstrate that the
accommodation would impose an undue hardship on the operation of the
business of such covered entity[.]

42 U.S.C. § 12112(b)(5)(A).

63.    Union Pacific discriminated against Vasquez by failing to provide

reasonable accommodations.

64.    Because Union Pacific violated the ADA, Vasquez has suffered and will

continue to suffer loss of income, emotional distress, and other damages in an amount in

excess of $75,000. Vasquez is also entitled to attorneys' fees and costs incurred in

connection with these claims.

65.    Union Pacific committed the above-alleged acts with reckless or deliberate

disregard for the rights and safety of Vasquez. As a result, Vasquez is entitled to punitive

damages.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff Rolando Vasquez prays for judgment against**

**Union Pacific as follows:**

1.    That the practices of Union Pacific complained of herein be determined and

adjudged to constitute violations of the ADA;

2.      An injunction against Union Pacific and its directors, officers, owners, agents,

successors, employees and representatives, and any and all persons acting in

concert with them, from engaging in each of the unlawful practices, policies,

customs, and usages set forth herein;

3.      For an award of damages arising from loss of past and future income, emotional

distress, and other compensatory damages in excess of $75,000.00;

4.      Pre-judgment interest, as provided by law;

5.      For Vasquez's costs, disbursements and attorneys' fees pursuant to law;

6.      For an award of punitive damages;

7.      For all relief available under the ADA;

8.      For such other and further relief available by statute; and

9.      For such other and further relief as the Court deems just and equitable.


Date: May 13, 2022

                                        **NICHOLS KASTER, PLLP**

                                        s/Paul J. Lukas
                                        Paul J. Lukas* (MN # 022084X)
                                              lukas@nka.com
                                        James H. Kaster** (MN # 0053946)
                                              kaster@nka.com
                                        Caitlin L. Opperman** (MN # 0399978)
                                              copperman@nka.com
                                        80 South Eighth Street
                                        4700 IDS Center
                                        Minneapolis, Minnesota 55402-2242
                                        Telephone: (612) 256-3200
                                        Fax: (612) 338-4878

                                        **ATTORNEYS FOR PLAINTIFF**

*\* Admitted generally to the W.D. Tex.*
*\*\* Pro hac vice application forthcoming*