IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROLANDO VASQUEZ, | § | |
| | § | |
| *Plaintiff,* | § | 5-22-CV-00478-OLG-RBF |
| | § | |
| vs. | § | |
| | § | |
| UNION PACIFIC RAILROAD CO., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns the parties' pending cross-motions for summary judgment in a case involving alleged violations of the Americans with Disability Act (ADA). *See* Dkt. Nos. 49 & 51. The motions have been referred for resolution, pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* January 29, 2024, and February 28, 2024, text orders. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 49, should be **DENIED**, and Defendant's Motion for Summary Judgment, Dkt. No. 51, should be **GRANTED.**

**Factual and Procedural Background**

This case concerns Plaintiff Rolando Vasquez's employment with Defendant Union Pacific Railroad Company and subsequent termination. Union Pacific hired Vasquez, as an

assistant signal person, on October 14, 2002. Dkt. No. 51-1 at ¶ 6; Dkt. No. 53-1 at ¶ 4. From 2002 until 2016, Vasquez worked for Union Pacific in various roles, including skilled signal maintainer and manager of signal maintenance. Dkt. No. 51-1 at ¶ 6; Dkt. No. 53-1 at ¶¶ 4-7. In December 2016, Vasquez began a new position as an electronic technician inspector, and he held that position until going on a medical leave of absence in June 2019. Dkt. No. 51-1 at ¶ 7; Dkt. No. 53-1 at ¶ 8.

As an electronic technician inspector, Vasquez worked in what Union Pacific called a "safety-critical position" and was "responsible for installing, maintaining, and restoring service to Union Pacific's telecommunications network." Dkt. No. 51 at ¶ 8; *see* Dkt. No. 53-1 at ¶ 50; *see generally* Dkt. No. 51-6 (Union Pacific Job Description Brief); 49-8 (same). In this role, he worked with "moving and high voltage equipment," drove company vehicles, and often worked alone in the field as a "one-man gang." Dkt. No. 51 at ¶ 8; *see also* Dkt. No. 51-6. According to Union Pacific's electronic technician inspector job description, the "essential functions" of the job generally involved "inspecting and testing electronic or microprocessor-based systems and components; troubleshooting malfunctions in those systems and components; repairing, installing, or dismantling those systems and components; working with tools and testing equipment; practicing safe work habits; and attendance." Dkt. No. 53-1 at ¶ 10; *see also* Dkt. No. 51-6, 49-8. The job description "also notes that it is generic and represents a composite across likely position assignments." Dkt. No. 53-1 at ¶ 10.

On June 8, 2019, Vasquez suffered an off-duty motorcycle accident. Dkt. No. 51 at ¶ 16. He sustained serious injuries, including lacerations to his spleen and scalp, a subarachnoid hemorrhage, a subdural hematoma, numerous fractures, and friction burns to his body. *Id.* During his hospitalization, Vasquez received anti-seizure medication, as a preventative, due to his

traumatic brain injury. *Id.*; Dkt. No. 53-1 at ¶ 20. On June 14, 2019, after he became "hypotensive and dizzy," Vasquez was immediately taken to surgery and underwent a splenectomy. *Id.*; Dkt. No. 51-1 at ¶ 35.

Vasquez remained hospitalized from the date of the accident until June 21, 2019. Dkt. No. 53-1 at ¶ 19. While in the hospital, Vasquez requested a "return to work date" and informed his doctors and nurses that he "work[ed] with railroad signals." Dkt. No. 51-1 at ¶ 39. Vasquez's doctors and nurse practitioner eventually opined that Vasquez could "return to work/school, no restrictions" effective July 29, 2019. *Id.* ¶ 40; Dkt. No. 53-1 at ¶¶ 71-73. But the nurse practitioner who completed the return-to-work form did not review the job description for Vasquez's position and "was not familiar with his job duties or essential job functions, the safety-sensitive nature of his job, the conditions under which he performed his job, or the safety rules promulgated by Union Pacific and other federal agencies that applied to his job." Dkt. No. 51-1 at ¶ 41; Dkt. No. 51-19 at 5-7 (Jeni Wilson Deposition). Nurse Practitioner Wilson likewise "did not assess Vasquez's ability to drive personal or company vehicles; operate on-track or mobile equipment; operate forklifts, cranes, or other heavy machinery; work at unprotected heights over 4 feet above the ground; or work alone or with only one other person in the field at Union Pacific." Dkt. No. 51-1 at ¶ 42; Dkt. No 51-19 at 7. Wilson was only aware that Vasquez was a railroad signal worker and that "no light duty was available in his job." Dkt. No. 53-1 at ¶ 73; Dkt. No 51-19 at 7.

Due to the nature of Vasquez's injuries, Union Pacific's Medical Rules required him to undergo a fitness-for-duty evaluation before he could be cleared to return to work. Dkt. No. 51. at 6-7. In performing the evaluation, Union Pacific consulted the Federal Motor Carrier Safety Administration's (FMCSA) guidance and recommendations. *Id.* at 7. Those guidelines, located

in the Federal Motor Carrier Safety Administration's Medical Examiner Handbook, had been removed from its website in 2014 and marked "no longer in use" in 2015. Dkt. No. 53-1 at ¶¶ 51-52. The guidelines were removed from the website because medical examiners "were confusing and co-mingling *mandatory* federal Regulations with the optional guidelines . . . and [ ] because the FMCSA wanted to revise and update the medical information" in the guidelines. Dkt. No. 51-1 at ¶ 102 (emphasis in original). Union Pacific's former Chief Medical Officer emailed Dr. Charbonneau, a Union Pacific doctor tasked with analyzing Vasquez's medical records, and explained that "FMCSA has taken the [Handbook] down from the website . . . however, I am still using it as a reference, and consider the latest formal guidance from the FMCSA." Dkt. No. 53-1 at ¶ 57. The FMCSA guidelines recommended that when a commercial driver has suffered a cortical and subcortical subarachnoid hemorrhage, as Vasquez did, the driver should be removed from service for five years due to the increased risk of seizures for that time period. Dkt. No. 51 at 7.

Union Pacific conducted an assessment of Vasquez's medical records and consulted with Dr. Diesing, a board-certified neurologist. *Id.*; Dkt. No. 51-1 at ¶¶ 62-70. On July 31, 2019, Dr. Charbonneau reviewed Vasquez's medical records. Dkt. No. 51-1 at ¶ 50. He did not physically examine Vasquez or speak with him. Dkt. No. 53-1 at ¶ 86. Dr. Charbonneau determined that Vasquez's traumatic brain injury was "at least mild and likely moderate." Dkt. No. 51-1 at ¶ 50. Dr. Charbonneau determined that Vasquez was not fit for duty and opined that due to his subarachnoid hemorrhage Vasquez should not return to a safety-critical position for five years. *Id.*

After receiving additional medical records, Dr. Charbonneau reviewed Vasquez's file again on August 12, 2019. *Id.* ¶ 52. Dr. Charbonneau concluded that Vasquez's traumatic brain

injury was "at least moderate," which, along with the subarachnoid hemorrhage, confirmed his earlier finding that Vasquez was subject to five years of work restrictions. *Id.* ¶ 53.

Union Pacific determined that, for a period of five years, Vasquez was restricted from: "(1) operating company vehicles, on-track or mobile equipment, or fork-lifts; (2) working on or near moving trains, freight cars or locomotives, unless protected by barriers; (3) operating cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee; (4) working at unprotected heights, over 4 feet above the ground (with the exception of working on truck beds and occupying bridges following normal safety practices); and (5) working on 1-man or 2-man gangs." Dkt. No. 51 at 7.

On August 14, 2019, a Union Pacific nurse spoke with Vasquez and informed him of the five-year restriction. Dkt. No. 51-1 at ¶ 55. Vasquez expressed his disagreement with the determination and said he was "looking at possibly getting moved to another position." *Id.*

In February 2020, Vasquez submitted additional medical records to Union Pacific, including evaluations performed by Dr. Wu, a neurologist. Dkt. No. 53-1 at ¶ 88. There was a mix-up on the record: Dr. Wu's report seemingly stated that Vasquez had a syncopal event on the day of his examination. *Id.* at ¶¶ 88-90. However, Dr. Wu reported that Vasquez's neurological examination was normal, and testing showed no seizure activity. *Id.* at ¶ 89.

In reviewing the records, Dr. Diesing, a Union Pacific doctor, noted that "the stated indication for Vasquez's visit to Dr. Wu, *i.e.*, syncope, was inconsistent with Dr. Wu's actual evaluation, which was for traumatic brain injury." *Id.* at ¶ 90. Dr. Diesing further noted that the only documentation of Vasquez experiencing a syncopal event was during his hospitalization, shortly before his splenectomy. *Id.*

Vasquez also submitted to Union Pacific a neuropsychological evaluation by Dr. Garcia. *Id.* at ¶¶ 91-94. Dr. Garcia's testing showed that Vasquez had "mild cognitive impairment." Dkt. No. 51-1 at ¶ 99. Dr. Garcia "concluded that Vasquez did not show any major neurocognitive impairment or functional issues and that a driving restriction did not appear warranted." Dkt. No. 53-1 at ¶ 91. Upon reviewing these documents, Dr. Hughes of Union Pacific determined that a "neuro file review would be necessary to determine risk for sudden incapacitation with traumatic brain injury." *Id.* at ¶ 94 (internal quotations omitted).

On April 11, 2020, Dr. Gillis, Union Pacific's Chief Medical Officer, issued a final determination on Vasquez's condition. Dkt. No. 53-1 at ¶ 99. Dr. Gillis echoed Dr. Charbonneau's opinion, concluding that "[b]ased upon [his] traumatic brain injury and subarachnoid hemorrhage location, Vasquez was at an increased risk for sudden incapacitation from seizures and require[d] certain work restrictions to insure [sic] [his] safety and the safety of those around him, to be in place for at least 5 years from the time of [his] accident." *Id.* at ¶ 101 (internal quotations omitted).

In June 2020, a Union Pacific vocational case manager spoke with Vasquez. Dkt. No. 51-1 at ¶ 81; Dkt. No. 53-1 at ¶ 128. Vasquez inquired about several positions, including a clerk position, a manager of signal maintenance position, and a position on a signal construction gang. Dkt. No. 53-1 at ¶ 128. Union Pacific told Vasquez that his restrictions could not be accommodated in the signal construction gang position. Dkt. No. 51-1 at ¶¶ 82-84; Dkt. No. 53-1 at ¶¶ 133-135. On a call with Union Pacific discussing the signal construction gang position, Vasquez "indicated he had a job offer with another company and that follow up for internal placement was unlikely to be needed." Dkt. No. 51-1 at ¶ 86 (internal quotations omitted).

On May 13, 2022, Vasquez filed a complaint in this Court alleging that Union Pacific, in making its fitness-for-duty determination, discriminated against him in violation of the ADA. Dkt. No. 1.

In the present cross-motions for summary judgment, Vasquez asks the Court to grant partial summary judgment on his disparate treatment claim, while Union Pacific seeks summary judgment on both of Vasquez's claims. Dkt. Nos. 49 & 51.

## Analysis

Plaintiff Rolando Vasquez's complaint raises three claims under the ADA. He has withdrawn his disparate-impact claim, *see* Dkt. No. 53 (Resp.) at 1, which leaves at issue a disparate-treatment claim and a reasonable-accommodation claim. The Court concludes that Union Pacific is entitled to summary judgment on the two claims at issue. Accordingly, Union Pacific's motion should be granted, and Vasquez's should be denied.

### A.    Vasquez's Disparate-Treatment Claim Fails Regardless of the Applicable Legal Framework.

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C.

§ 12112(a). Vasquez's ADA disparate-treatment claim requires that he show (1) he is disabled within the meaning of the ADA; (2) he is qualified, with or without a reasonable accommodation, to perform his job's essential functions; and (3) he suffered an adverse employment action because of his disability. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020); *Rizzo v. Children's World Learning Centers, Inc*., 84 F.3d 758, 762 (5th Cir. 1996) (hereinafter *Rizzo I*) (direct-evidence case).

Thus, to ultimately prevail the plaintiff must prove causation, which is to say he must prove that an adverse employment decision was made "because of his disability." *Atkins v. Salazar*, 677 F.3d 667, 675 (5th Cir. 2011). To do so, he may "present direct evidence that he was discriminated against because of his disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)." *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017) (quotation and brackets omitted, citation shortened). "If the plaintiff produces direct evidence that discriminatory animus played a role in the employer's adverse employment decision, the burden of persuasion shifts to the defendant who must prove that it would have taken the same action despite any discriminatory animus." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019)

      1.    *Fifth Circuit ADA precedent is muddled and ought to be clarified*. There are two areas of uncertainty in the ADA case law concerning how cases should be framed and analyzed when a defendant invokes safety concerns in connection with an adverse employment decision. A short description of this double uncertainty is warranted because the Fifth Circuit should—at an appropriate time—address and resolve it.

      *First*, ADA cases involving safety concerns are treated by the courts or parties as involving direct evidence of discrimination. This is particularly true if the employer *admits* to acting because of the alleged disability.[1] Under this approach, courts focus at summary judgment not on causation, which is easily shown to involve a triable issue, but instead on whether the admitted discrimination was justified. *See e.g.*, *Rizzo I*, 84 F.3d at 763 ("[T]he question is

---

[1] *See, e.g.*, *Rizzo I*, 84 F.3d at 762 ("Children's World does not deny that Rizzo was removed from driving duties because of her hearing impairment."); *Cannon v. Jacob Field Servs. N. America, Inc.*, 813 F.3d 586, 594 (5th Cir. 2016) (finding causation "easily resolve[d]" when a company revoked a job offer because plaintiff's shoulder injury would prevent him from climbing a ladder; *Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468, 480 (5th Cir. 2006); *see also Nall*, 917 F.3d at 349-52 (Costa, J., concurring).

whether the person is able to safely drive the van and not present a direct threat to the children's safety."). But other similar cases do not involve this type of a concession by the defendant. These cases—whether due to that lack of a concession or otherwise—use the *McDonnell Douglas* framework for indirect evidence. *See, e.g.*, *Nall*, 917 F.3d at 349-52. Here, unsurprisingly, Vasquez invokes the direct-evidence framing while Union Pacific invokes the indirect-evidence framing.

*Second*, as the Fifth Circuit recently acknowledged in an unpublished decision, there is a disconnect in the law about burdens. *See Carrillo v. Union Pac. R.R. Co.*, 2024 WL 3861374 at *3 (5th Cir. 2024) (per curiam). Indeed, in this Circuit it is unsettled who bears the burden, a plaintiff or defendant, when an employee's alleged inability to perform a job's duties implicates the safety of others. *See Nall*, 917 F.3d at 343 n.5 (citing *Rizzo v. Children's World Learning Centers, Inc.*, 213 F.3d 209, 213 & n.4 (5th Cir. 2000) (en banc) (hereinafter *Rizzo II*)), and explaining that the question of who bears the burden is an open one). Sometimes the issue is raised via the so-called direct-threat defense invoked by a defendant as an affirmative defense, making it the defendant's burden to show the defense is established. *See, e.g.*, *Hernandez v. W. Tex. Treasures Estate Sales, L.L.C.*, 79 F.4th 464, 470 (5th Cir. 2023) (reversing Rule 12(b)(6) dismissal on direct-threat defense because the issue was raised as an affirmative defense). Yet at other times the issue is framed as involving a plaintiff's burden to show he is qualified for the job in light of an alleged inability to safely perform the job's essential functions. *See, e.g.*, *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265-66 (5th Cir. 1998) (reversing and rending on accommodation claim and noting that "[i]f the disabled person must be exempted from performance of an essential function of the job, then she is not otherwise qualified and not

protected by the ADA."); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997); *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).

Having highlighted these areas of confusion, this Court need not—and does not—resolve them. This is because Union Pacific is entitled to summary judgment whether this is a direct- or indirect-evidence case and regardless of who bears the burden on the direct-threat issue. *See Carrillo*, 2024 WL 3861374 at *3 (declining to reach plaintiff's qualifications to perform essential functions and affirming grant of summary judgment on direct-threat defense). That is to say, even assuming it is Union Pacific's burden to establish the direct-threat defense as a matter of law, Union Pacific has carried that burden here.

       **2.**     *If the Court were to rule on the direct-evidence issue, it would conclude Vasquez has not shown direct evidence of discrimination.* Vasquez's motion and response brief, citing the bare fact of his fitness-for-duty evaluation and resulting restriction, Dkt. No. 49 at 11, Resp. at 3-4, invokes the direct-evidence formulation for his claim. Dkt. No. 53 at 2-6, *id.* at 3 ("Dr. Charbonneau's and Dr. Gillis's fitness-for-duty decisions expressly admit that Defendant imposed severe work restrictions on Vasquez that prevented him from returning to work because of Vasquez's record of traumatic brain injury and their perception that this injury presented an ongoing risk of sudden incapacitation."). Were the Court required to resolve this issue, it would conclude that, contrary to Vasquez's assertions, the bare fact that Vasquez received a fitness-for-duty evaluation pursuant to a Reportable Health Events policy is not direct evidence of discrimination. Nor would Union Pacific's reasonable conclusions and actions stemming from that evaluation, on the present record, constitute direct evidence.

Direct evidence in this context is evidence that, "if believed, [ ] proves the fact of discriminatory animus without inference or presumption." *Kitchen v. BASF*, 952 F.3d 247, 252

(5th Cir. 2020) (quotation omitted). Simply put, an inference or presumption is required here to find that Union Pacific's policy requiring a fitness-for-duty evaluation is discriminatory. The same is true of the action taken following the evaluation. This is because it must be inferred or presumed that the evaluation was administered, or the action was taken, due to the employee's disability and not solely because of an inability to perform the job's essential functions safely. In this way, the ADA could very well differ from other anti-discrimination statutes. A person's race, for example, could never affect performance of a job's essential functions like a serious injury or illness might.

Contrary to Vasquez's characterization of the evidence, Union Pacific does not admit that it restricted Vasquez because he is disabled. *Cf., e.g.*, *Rizzo I*, 84 F.3d at 762 ("Children's World does not deny that Rizzo was removed from driving duties because of her hearing impairment."). Union Pacific here only admits that it restricted Vasquez because it determined he cannot safely perform his job's essential functions. That is no more direct evidence of discrimination than it would be if Union Pacific were to deny a job to an applicant at the outset because the applicant— for whatever reason—could not perform the job's essential functions. *See Jones*, 142 F.3d at 265-66 ("If the disabled person must be exempted from performance of an essential function of the job, then she is not otherwise qualified and not protected by the ADA.").

The cases Vasquez cites on this point do not require adopting his position. Vasquez cites a concurrence in *Nall*, which is an implicit concession that his position doesn't reflect binding Fifth Circuit precedent. *See* Resp. at 3 (citing *Nall v. BNSF Railway Co.*, 917 F.3d at 349-52 (5th Cir. 2019) (Costa, C.J., concurring)). Other cases cited only reinforce Vasquez's erroneous reading of the law. In *Rizzo I*, 84 F.3d at 762, the defendant conceded it discriminated because of the plaintiff's disability. So too in *Rodriguez*, 436 F.3d at 480, where everyone agreed direct

evidence was at issue. *Id*. ("This case is one of those rare ADA cases in which we are presented with *direct* (rather than circumstantial) evidence of discriminatory intent: ConAgra and Ms. Zamora have both *admitted* that Rodriguez did not get his job because of his allegedly uncontrolled diabetes." (emphasis in original)).

But ultimately this Court does not need to reach the issue of whether direct or indirect evidence is presented here. As discussed next, Union Pacific is entitled to judgment as a matter of law on its contention that it was justified in taking the action it took. Union Pacific has shown that it acted in an objectively reasonable manner when concluding Vasquez presented a direct threat to safety, even if the issue is treated as an affirmative defense and the burden is Union Pacific's to establish it as a matter of law.

      **3.**    *The essential functions of the job included working on or around moving and high voltage equipment and driving company vehicles.* The Court first explores preliminarily Union Pacific's framing of the issue in dispute, which places the burden on Vasquez to show he is qualified for the job in question. A "qualified individual" is one "who, with or without, reasonable accommodation, can perform the essential functions" of the position in question. 29 C.F.R. § 1630.2(m); *see also* 42 U.S.C. § 12111(8); *Nall*, 917 F.3d at 342. "The term *essential function* means the fundamental job duties of the employment position . . . ." 29 C.F.R. § 1630.2(n)(1) (emphasis in original); *Nall*, 917 F.3d at 342 ("A function is 'essential' if it bears 'more than a marginal relationship' to the employee's job." (quotation omitted)). "If the disabled person must be exempted from performance of an essential function of the job, then [ ]he is not otherwise qualified and not protected by the ADA." *Jones*, 142 F.3d at 265.

To determine whether a job function is essential, courts "look to several factors, such as the 'employer's judgment as to which functions are essential' and 'the consequences of not

requiring the incumbent to perform the function.'" *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) (quoting 29 C.F.R. § 1630.2(n)(3)(i)-(vii)). Other evidence that may inform what constitutes an essential function includes "written job descriptions prepared before advertising or interviewing applicants for the job," "the amount of time spent on the job performing the function," and "the work experience of both past and current employees in the job." *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007) (quotation of 29 C.F.R. § 1630.2(n)(3)(i)-(vii) omitted).

Vasquez lists the essential functions of the Skilled Electronic Technician Inspector position by referencing Union Pacific's job description, which Vasquez describes as requiring the following:

> inspecting and testing electronic or microprocessor-based systems and components; troubleshooting malfunctions in those systems and components; repairing, installing, or dismantling those systems and components; working with tools and testing equipment; practicing safe work habits; and attendance.

Dkt. No. 53-1 at ¶ 10. But Vasquez also readily concedes that a written job description is not the only information relevant to this inquiry. *See* Dkt. No. 53 at 11. Moreover, Union Pacific clarifies, and Vasquez does not dispute, that the job in question calls for "installing, maintaining, and restoring service to Union Pacific's telecommunications network," which in turn involves "work[ing] on or around moving and high voltage equipment," "driv[ing] company vehicles," and frequent work in the field alone as "a 'one-man gang.'" Dkt. No. 51 at 1.

The Court finds it beyond dispute, and therefore established as a matter of law, that the Skilled Electronic Technician Inspector position is a safety-critical position and that working "on or around moving and high voltage equipment" and driving company vehicles are among the job's essential functions that necessarily implicate the safety of Vasquez and others. *Id.*; *see* Dkt. No. 51-1 at ¶¶ 8-10, 72-80; *see also* Dkt. No. 53-1 at ¶ 50. Accordingly, if Vasquez was

"medically unqualified" to perform any such essential function of the job, he was unqualified for the position. *Foreman*, 117 F.3d at 809.

       **4.**     *The Court next explores the framing of the pertinent issue as presenting an affirmative defense*. An employee presents a direct threat to safety if the employee "poses a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Nall*, 917 F.3d 335, 342 (5th Cir. 2019). An employer's assessment that an employee poses a direct threat "must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job.'" *Id.* (brackets omitted and quoting *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002)). Thus, "[w]hether an employer has properly determined that a person poses a direct threat depends on the objective reasonableness of the employer's actions." *Id.* (quotation and brackets omitted).

     Here, "the question . . . is not whether it was reasonable for [Union Pacific] to conclude that an employee with [a subarachnoid hemorrhage] could pose a direct threat; the question is whether [Union Pacific] reasonably concluded that [Vasquez] posed a direct threat via an individualized assessment that relied on the best available objective evidence." *Nall*, 917 F.3d at 344. In answering this question, the Court considers four factors: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r); *Carrillo*, 2024 WL 3861374 at *4.

With the issue so framed, summary judgment is appropriate for Union Pacific only if Union Pacific has established as a matter of law the objective reasonableness of its conclusion that Vasquez posed a direct threat. *See Carrillo*, WL 3861374 at *3-*5.

> **5.**     *Union Pacific's decision to restrict Vasquez's job duties was objectively reasonable*. Summary Judgment for Union Pacific is warranted on Vasquez's disparate-treatment claim. There is no genuine issue of material fact concerning Union Pacific's objectively reasonable decision to restrict Vasquez for five years after it conducted an individualized assessment based on the best available objective evidence and pertinent standards. Considering the four pertinent factors listed above, the Court finds that Union Pacific's decision was justified as a matter of law. *See* 29 C.F.R. § 1630.2(r); *see Carrillo*, 2024 WL 3861374 at *3-*6.

Union Pacific relied on current medical knowledge and pertinent FMCSA guidance to conclude that Vasquez's subarachnoid hemorrhage placed him at increased risk of seizure and sudden incapacitation within the first five years. *Id.* at ¶¶ 72-73, 93-104. The decision to restrict Vasquez for five years was made by qualified medical professionals. Union Pacific relied on evaluations from Drs. Charbonneau, Hughes, Diesing, and Gillis based on extensive reviews of Vasquez's medical records. Dr. Gillis made the final determination that Vasquez should be restricted from performing certain job duties for five years, relying on the opinions of the other Union Pacific doctors and the opinions of Vasquez's doctors contained in his medical records.

Union Pacific did not categorically issue restrictions; it considered Vasquez's individual medical condition. *See* Dkt. No. 51-1 ¶¶ 28-29, 44-80. On multiple occasions, Vasquez submitted different and updated medical records, which were all thoroughly considered by Union Pacific's doctors. Although Union Pacific's doctors did not personally meet with and examine Vasquez, they "relied on extensive medical reports submitted by the doctors who did." *Carrillo,*

2024 WL 3861374 at *4. The doctors undertook multiple rounds of evaluations before making a final decision on Vasquez's fitness to return to work, and the doctors took into account the specifics of Vasquez's medical conditions and history as well as the opinions of his doctors. *See id.* ("It is unclear what more [Vasquez] would have Union Pacific do to individualize its evaluations.).

Union Pacific's restrictions "properly accounted for the duration of the risk, the nature and severity of potential harm, the likelihood of potential harm, and the imminence of potential harm." *Id.* (citing 29 C.F.R. § 1630.2(r)). Union Pacific relied on medical guidance which explains that a cortical or subcortical subarachnoid hemorrhage (like Vasquez's) is associated with an increased risk for seizures. Dkt. No. 51-1 ¶ 93. For this reason, the medical guidance recommends a five-year waiting period. *Id.* ¶ 94. As such, the duration of the risk, as well as the likelihood and imminence of potential harm were properly considered. Additionally, considering Vasquez's job, which involved working with high-voltage equipment and heavy machinery, sometimes alone, the nature and severity of potential harm was great.

Union Pacific's decision to restrict Vasquez from his position for five years, as opposed to two years, was reasonable. Union Pacific reasonably determined that Vasquez needed five years of sudden incapacitation work restrictions after its doctors and Dr. Diesing concluded that the location of Vasquez's subarachnoid hemorrhage placed him at increased risk for future seizures. Dkt. No. 51-1 ¶¶ 62-73.

Vasquez urges that Union Pacific should have opted for the two-year waiting period applicable to moderate traumatic brain injury without seizure instead of the five-year waiting period applicable to cortical and subcortical subarachnoid hemorrhages. "But, the employer's conclusion does not have to be correct to satisfy the objective reasonableness standard."

*Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *9 (E.D. La. Sept. 10, 2020) (citing *Nall*, 917 F.3d at 346 n.8). "[T]he question is not whether the employer was correct about the risk the employee posed, but instead concerns whether the employer's decision was objectively reasonable based upon the information before it." *Goode v. BNSF Ry., Inc.*, No 18-319, 2020 WL 1527864, at *6 (N.D. Tex. March 20, 2020) (citing *Nall*, 917 F.3d at 346 n.8). Union Pacific notes that the FMCA's 2014 Medical Examiner Handbook guidance indicates the risk for seizure after a subarachnoid hemorrhage is associated with the location of the hemorrhage, not its cause. Dkt. No. 51-1 ¶ 93. When a subarachnoid hemorrhage is located, like Vasquez's, in the cortical or subcortical areas of the brain, Union Pacific explains, the risk for seizures is higher and, as a result, the Medical Examiner Handbook recommends a five-year waiting period. Dkt. No. 51-1 ¶¶ 93-94. Union Pacific also explains that the Handbook provides that if more than one waiting period applies due to multiple conditions, the longest waiting period should be applied. Dkt. No. 51-1 ¶ 95. Vasquez offers no convincing response on these points.

Vasquez's argument that the 2014 Handbook uses inapplicable standards fails to convince or create a disputed fact issue. That the documents "were created for vehicle carriers" does not mean that a railroad company may not consult them. *Carrillo*, 2024 WL 3861374 at *5. "[A]fter failing to adopt its own comprehensive standards, the Federal Railroad Administration encouraged railroad companies to look to regulations governing other transportation regulatory bodies." *Id.* In the absence of controlling standards, Union Pacific's reliance on the closest available standards was reasonable. *See id.* at 9 ("[T]he [FMCSA] guidance documents were evidence-based and developed through a consensus of medical experts.") The former Union Pacific Chief Medical Officer instructed Dr. Charbonneau that "FMCSA has taken the [2014

Handbook] down from the website . . . however, I am still using it as a reference, and consider the latest formal guidance from the FMCSA." Dkt. No. 53-1 at ¶ 57.

Union Pacific also reasonably considered the safety-critical nature of Vasquez's essential job duties. The position involved working with high voltage equipment—often alone. It also required driving company vehicles. Dkt. No. 51-1 ¶¶ 8-10, 76-80 93-104.

Vasquez responds that he undoubtedly was qualified, or at least there is a fact question as to his qualifications, because of his "lengthy work history and the testimony of his managers, who agree that he met the necessary prerequisites for the [job] position and could perform its essential functions." Dkt. No. 53 at 12; Dkt. No. 49 at 9 ("Vasquez's immediate supervisor Mario Alcala and director Mark Miner both had the opportunity to observe Vasquez working during the two and a half years Vasquez worked in the ETI position and had no concerns about his qualifications and ability to perform the job"); *id.* at 9-10 ("Vasquez had both performed the ETI job himself previously and supervised ETIs during the five years he was a manager."); *id.* at 10 ("Further, in his nearly 17 years of employment with Union Pacific, Vasquez did not have any disciplinary or safety issues"); Dkt. No. 53-1 at ¶¶ 11-12. But statements by managers regarding Vasquez's performance or qualifications *before* his motorcycle accident are irrelevant to his qualifications *after* the accident. Thus, Vasquez's "lengthy work history and [the] testimony of his managers" regarding his ability to perform his essential job functions *before* his subarachnoid hemorrhage are irrelevant to the court's analysis and fail to create a triable issue of fact. Dkt. No. 53 at 12.

Moreover, in opining that Vasquez was qualified and could perform the essential functions of the electronic technician inspector position, Vasquez's manager relied on the fact that Vasquez was "cleared by his treating doctors." Dkt. No. 49-7 at 135 (Alcala Dep.). This is

insufficient to create a triable fact question. Vasquez's manager was not in any position to offer insight on how Vasquez's medical condition could or could not affect his ability to do his work safely. While the manager relied on the doctors' clearance, the problem with relying on this evidence is that the doctors were not familiar with the essential functions of the electronic technician inspector position. Without evidence that Vasquez's doctors cleared him to work *in the specific essential functions of his job*, this argument is irrelevant and insufficient to raise a fact issue.

Accordingly, Vasquez's argument about the conclusions of his treating medical providers also fails to create a triable issue of fact. These providers, Vasquez says, "cleared him to return to work as of July 29, 2019." Dkt. No. 53 at 11. As already explained, these providers did not opine on Vasquez's ability to perform the job's essential functions safely; they didn't know the job's essential functions, and Vasquez never argues that they did.

Consequently, Union Pacific's decision to issue Vasquez functional work restrictions was objectively reasonable, and no genuine issue of material fact implicating this conclusion is presented.

### B.  Vasquez's Failure-to-Accommodate Claim Fails.

Vasquez argues that Union Pacific should have accommodated his restrictions in his electronic technician inspector job. However, the requested accommodation would require Vasquez to be relieved of performing essential functions of the job. Former Director of Signal Maintenance Mark Miner testified unequivocally on this topic. Dkt. No. 51-1 at 18 (citing specific testimony). For Vasquez to continue in his electronic technician inspector position despite the multiple restrictions imposed on him for five years, Vasquez would not be able to perform various essential functions of the position. *Id*. Ultimately, Vasquez was not qualified for

the position. *See Credeur v. Louisiana Through Office of Attorney Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) ("At issue is whether Credeur is a 'qualified' individual within the meaning of the ADA. If she is not, our inquiry ends."). Because Vasquez was not qualified for the position, due to his inability to safely perform various essential functions of the job, his failure-to-accommodate claim fails.

Vazquez also argues that "reassignment to a different position can be a reasonable accommodation." Dkt. No. 53 at 19. He invokes three positions to which he could've been reassigned: "a signal construction gang position, a clerk position, and a manager of signal maintenance position." *Id*. Testimony from Director of Signal Construction Mike Choate about the signal construction gang position "indicated [Choate] would be unable to accommodate Vasquez's restrictions." Dkt. No. 51 at 19; Dkt. No. 53 at 20. Vasquez disputes this, contending that because driving was not an essential function of the job, he was qualified. Dkt. No. 53 at 20. But as Union Pacific explained, while Choate testified that he "may have been able to accommodate Vasquez's individual restrictions . . . for a short period of time; he could not accommodate the entirety of Vasquez's restrictions for 5 years." *See* Dkt. No. 55 at 10. Accordingly, it is beyond dispute that Vasquez couldn't have performed the job's essential functions given his five-year restrictions.

As to the other two different positions, Vasquez testified that when he pursued these options with Union Pacific he was not talking about "particular" positions but merely "generally talking about different types of jobs" he believed he could do based on his work history with the company. Dkt. No. 51-4 (Vasquez Dep.) at 44. This is fatal to Vasquez's accommodation claim because he "bears the burden of proving that an available position exists that he was qualified for," and he has made no showing at all on that issue. *Moss v. Harris Cty. Constable Precinct*

*One*, 851 F.3d 413, 418 (5th Cir. 2017). Further, the undisputed evidence reflects that Vasquez broke off discussions about other positions when he "indicated he had a job offer with another company and that follow up for internal placement was unlikely to be needed." Dkt. No. 51-1 at ¶ 86 (internal quotations omitted).

## Conclusion and Recommendation

For the reasons discussed above, it is recommended that Plaintiff's Motion for Summary Judgment, Dkt. No. 49, be **DENIED.** It is recommended that Defendant's Motion for Summary Judgment, Dkt. No. 51, be **GRANTED.**

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by the district court's standing orders. *See* Rule CV-7. The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985);

*Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 26th day of August, 2024.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE